Leonard W. Lea and Inez H. Lea v. Commissioner. Leonard W. Lea v. Commissioner.
Lea v. Commissioner
Docket Nos. 55940, 55941.
United States Tax Court
T.C. Memo 1957-119; 1957 Tax Ct. Memo LEXIS 137; 16 T.C.M. (CCH) 490; T.C.M. (RIA) 57119; June 28, 1957
*137 Held, that returns filed by the petitioners for the years 1946 through 1949 were not false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code; and that assessment and collection of any deficiency or addition to tax for said years are barred by limitation, under section 275(a) of said Code. Held, further, that as to the year 1950 where the amount of net income, which respondent determined by estimate through use of the net worth method, is (after adjustment for determined errors) not greatly in excess of the net income per return, the petitioners' books of account on which the return was based should be regarded as evidence having greater weight than the estimate, and that there is no deficiency, and no addition to tax for fraud, in respect of said year. John Y. Merrell, Esq., Shoreham Building, Washington, D.C., for the petitioners. John L. Carey, Esq., for the respondent. PIERCE *138 Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioners' income taxes, and also additions to tax, as follows: Additions to Tax
Failure
Substantial
to File
Under-
Declaration of
estimate of
Fraud
Estimated Tax
Estimated Tax
Docket Nos.
Year
Deficiencies
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
55941
1946
$10,382.99
$5,191.50
$1,174.84
$704.91
1947
4,661.16
2,330.58
55940
1948
5,500.76
2,899.17
321.81
1949
379.96
189.98
1950
3,644.60
1,822.30 The two cases, bearing the above docket numbers, were consolidated for trial. The issues for decision are: (1) Whether assessment and collection *139 of deficiencies and additions to tax, for each of the years 1946 through 1949, are barred by limitation, under section 275(a) of the 1939 Code; and the answer to this depends solely on whether the return for each of said years was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of said Code, since the Commissioner does not rely on the 5-year period prescribed by section 275(c). This issue is not present for the year 1950, because petitioners concede that the period of limitation for said year was extended by the execution of a consent (Form 872). (2) Whether as to the year 1950, and any other year not barred by limitation, the deficiencies and additions to tax determined by the respondent should be approved. Petitioners have presented no defense to the additions to tax under sections 294(d)(1)(A) and 294(d)(2), other than the statute of limitations. Findings of Fact Certain facts have been stipulated; and the stipulation, with the exhibits attached thereto, is incorporated herein by reference. Also, by order entered pursuant to agreement of the parties, the evidence received in the prior case of Leonard W. Lea, Docket No. 51929 (T.C. Memo. 1957-31) [16 TCM 144,] *140 was incorporated into the record of the instant case. Petitioner Leonard W. Lea filed an individual income tax return for each of the years 1946 and 1947. During 1948, he and petitioner Inez H. Lea were married; and thereafter, they filed a joint income tax return for each of the years 1948, 1949 and 1950. All the above-mentioned returns were filed with the then collector of internal revenue for the district of Virginia. Petitioner Leonard W. Lea (hereinafter called the "petitioner") was 58 years of age, at the time of the trial. He had attended school through the fifth or sixth grade, and also had received some part-time schooling. During all years involved, he was the owner and operator of moving picture theaters in Danville, Virginia. Petitioner's first contact with the theater business was at the age of about 24 years, when he became assistant secretary of the Y.M.C.A. at Schoolfield, Virginia, and as part of his duties there, operated a moving picture theater for the Y.M.C.A. on two nights per week. He held this position until August 1930; and he then worked for about 4 months as an attendance checker for motion picture distributors, and for about 3 months as manager of *141 another theater in Danville. In March 1931 he acquired a lease on the Y.M.C.A. theater in Schoolfield which he previously had managed; and he operated the same as a proprietor until January 1, 1945. This theater is not involved in the instant case. In the latter part of 1939, petitioner began operation, under lease, of a theater in Danville, known as the Lea Theater; and he operated this as a sole proprietor until January 1951. Also, in August 1947, he commenced operation of another theater in Danville, known as the North Theater, which he built on property owned by him; and he likewise operated this as a sole proprietor from August 1947 through the year 1950. Petitioner's operations of the Lea and North Theaters were similar. He was the only independent operator in the Danville area; and, by reason of this fact, he could obtain only second and third-run pictures. His admission prices were very low. The gross receipts of each theater consisted of proceeds from the sale of tickets at the box office; proceeds from the sale of popcorn, candy and soft drinks at the refreshment stand; and small amounts from vending machines in the theaters and from screen advertising. The system used *142 to record the receipts and expenses of operation was substantially as follows. The cashier in the box office of each theater kept, on a printed form, an hourly record (hereinafter called the "daily box office report") of each day's operations; and on this she entered the number of tickets sold, the ticket prices, and the total receipts from tickets, all for each hour of the day that the theater was open. The tickets were numbered consecutively, and all of them were sold from rolls contained in a magazine in the box office. No ticket was sold other than from these rolls. The cashier was held accountable for the number of tickets sold, and also for the cash received therefor - all as recorded on the daily box office report. Whenever the cashier was relieved during the course of the day, she made an accounting with her substitute for the tickets sold and for the cash on hand. Many of the films for the theaters were rented on a percent-of-receipts basis; and attendance checks made by the lessors of such films provided an additional check on the accuracy of the box office reports. At the end of each day, the cashier would enter totals on the daily box office report of the number of *143 tickets sold during the day, and of the receipts therefrom. She then would place in a box, both the report and the money on hand, and would deliver these to the person in charge of the theater. Thereupon, such person would remove the money from the cash register at the refreshment stand, check the amount thereof against the reading of the register, and make a notation of such amount on the back of the daily box office report. The aggregate of each day's receipts from the box offices of the two theaters and from the refreshment stands (all as shown on said reports), together with the above-mentioned minor amounts from theater vending machines and screen advertising, constituted the entire receipts from petitioner's theater operations for each day. The gross receipts from the business, per returns, for each of the years here involved were as follows: Year
Gross Receipts
1946
$135,543.94
1947
166,063.18
1948
206,814.50
1949
185,919.90
1950
228,609.45
At the principal office for the two theaters, which was located in the Lea Theater building until August 1947, and thereafter in the North Theater building, an account book, called the "cash and receipts and disbursement *144 journal," was maintained, on which there were entered the receipts and expenses of both theaters. The receipts so recorded were those shown on the daily box office reports. The journal contained long columnar sheets on which were reflected, according to days and months: (1) The amounts deposited in the theater bank account, from receipts of the business; (2) a description of each check for expenses drawn against said bank account, which included the check number, the amount thereof, and the name of the payee; and (3) a distribution of expenses to journal columns bearing such headings as "feature film rental," "supplies," "house salaries," and "general expenses." Expenditures made on behalf of petitioner personally, were entered in the "house salaries" column; and, although petitioner's instructions were that these should be marked with his initials so as to distingish them from expenses of the business, this was not always done. For the years 1946 through 1949, said cash receipts and disbursements journal and said daily box office reports, together with certain weekly estimate sheets and certain payroll records, were the only permanent accounting records for the two theaters. However, *145 in 1947, the arrangement of the journal was revised by a certified public accountant, so that items of receipts and items of disbursement were entered on separate columnar pages; and also, so that expenditures made on behalf of petitioner personally, were entered in a separate column. All entries in this journal were made by petitioner's bookkeeper, Delphia Boyter, who had been employed at the theaters since 1942. Petitioner did not make any of the entries, nor did he prepare any of the daily box office reports. In 1950, a general ledger and general journal were set up by a certified public accountant, for the first time. Delphia Boyter also made the bank deposits of all theater receipts, except those for Saturdays and Sundays which were deposited by petitioner on Sunday nights. The theater bank account was at the American National Bank and Trust Company, in Danville. Each morning, she took the receipts of the previous day from the office safe, where they had been deposited on the previous evening; ascertained that the same were in accord with the total shown on the daily box office report; and then deposited the same. In addition to said theater bank account, petitioner maintained *146 a separate personal checking account in the same bank, which was known as the Old Reliable account. This latter account had been taken over by petitioner, in about 1930, from a dissolved partnership, known as Old Reliable Products Company, of which he had been a member. Until 1942 this account had been relatively inactive; but, beginning in the latter year and during all taxable years here involved, it was used as a depository for petitioner's personal funds. Also, during the years here involved, petitioner maintained other checking accounts in the Lewis State Bank and in the Capitol City National Bank, both located in Tallahassee, Florida, where he had purchased a house in 1946 for his personal use. Petitioner's only gross income for each of the taxable years involved, other than that from his theater business, consisted of rentals from apartment houses in Danville which he had acquired in 1937 and 1938, and rentals from the above-mentioned house in Tallahassee, Florida, which he rented to other persons during the years 1949 and 1950. His wife's only gross income, after her marriage to him in 1948, consisted of rentals from an apartment which she had acquired prior to said marriage, *147 salaries received from petitioner's theaters in 1948 and 1950, and other salaries received from an unrelated company in 1949 and 1950. The aggregates of all such miscellaneous income of petitioner and his wife, were: 1946
$1,092.35
received by petitioner
1947
1,600.00
received by petitioner
1948
4,820.00
received by petitioner and his wife
1949
3,969.22
received by petitioner and his wife
1950
4,493.33
received by petitioner and his wife
Petitioners' income tax returns for all years involved were timely filed. They all reflected the entries shown in petitioner's books of account; and they also included the above-mentioned miscellaneous items of income. An amended return for 1948 was filed, which disclosed additional net income of $1,700 resulting from an adjustment of depreciation. Also, an amended return for 1949 was filed, which reported a decrease of $184 in net income, resulting from an unspecified minor adjustment. All of the above-mentioned returns were prepared by certified public accountants. In 1950 respondent's agents began their investigation of petitioner's returns for 1948 and 1949; and they thereafter extended such investigation to *148 cover the returns for all years here involved. Petitioner submitted to the examining agents, all of his records and bank accounts, except those pertaining to the two bank accounts in Florida, which were not readily available. Petitioner co-operated fully with the respondent's agents in their investigation; and he made no effort to withhold any information. Respondent's notices of deficiency were mailed to petitioners on October 21, 1954, which was more than 3 years after the filing of the returns for all years involved, and more than 7 years after the filing of the return for the earliest year involved. All deficiencies set forth in said notices of deficiency were determined through the use of the so-called net worth plus nondeductible personal expenditures method. No adjustment was made to any specific item of income or deduction reported on the returns. The amounts of estimated understatement of net income, determined by said method, were: Estimated
Year
Understatement
1946
$21,491.10
1947
15,938.91
1948
19,294.45
1949
2,475.16
1950
11,223.66
The net worth computations, through which said estimated understatements of net income were determined, contained *149 a number of errors. The errors embodied in the computations for the two most recent years of 1949 and 1950, included the following: "1949: Respondent's net worth computation for this year reflected an estimated understatement of net income of $2,475.16. The computation was erroneous, at least in the following respects: "$132.70, representing deductible taxes and expenses in connection with petitioner's rental property in Florida, was added to his nondeductible expenditures. "At least $550, representing deductible medical expenses reported on petitioners' return, was added to his nondeductible expenditures. "And $515.85, representing payments on a personal indebtedness, was included twice in the estimated income - once as a reduction of liability, and again as an item of nondeductible expenditure. "After adjustment is made for these errors, the spread between respondent's estimated net income for the year, and the net income reported on the return, is not more than $1,276.61. "1950: Respondent's net worth computation for this year reflected an estimated understatement of net income of $11,223.66. The computation was erroneous, at least in the following respects: "$399.76 *150 represents an overstatement of expenditures, due to a mathematical error. " $200 represents an overstatement of expenditures, due to failure to eliminate an advancement to petitioner's wife, which was refunded. "$236.45 representing deductible taxes and expenses on rental property in Florida was added to nondeductible expenditures. "$3,957.53 represents an account payable for merchandise included among the assets of the theaters, for which no allowance was made. "$563.20 represents a liability for taxes withheld in respect of wages of employees, for which no allowance was made. "$3,480.20 represents a nontaxable receipt from surrender of insurance policies, which was not eliminated from the estimated income. "After adjustment is made for all the above errors, the spread between respondent's estimated net income for the year, and the net income reported on the return, is not more than $2,386.52." None of the returns filed by the petitioners for the respective taxable years here involved was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. No part of deficiency for any of the taxable years involved was due to fraud with *151 intent to evade tax, within the meaning of section 293(b) of said Code. Opinion I The first and principal issue for consideration herein is whether assessment and collection of deficiencies and additions to tax for the years 1946 through 1949 are barred by limitation under the applicable provisions of the 1939 Code; [1] and the answer to this, as we have hertofore said, depends solely on whether the return for each of said years was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of said Code. The burden of proving fraud is upon the respondent. [2] It is well settled that fraud is never presumed; that there is no presumption of correctness attaching to any determination of fraud made by the Commissioner; that an issue of fraud should be decided on the weight of the evidence; and that such evidence must be clear and convincing. Henry S. Kerbaugh, 29 B.T.A. 1014. *152 In the instant case, the respondent has relied principally, to carry such burden, upon estimates of the petitioners' net incomes computed through use of the so-called net worth plus nondeductible personal expenditures method. He made no adjustment, in his notices of deficiency, to any specific item of income or any specific item of deduction, reported on the returns. He contends that his estimated understatements of net income for all years involved, as reflected by his net worth computations, indicate that the returns were fraudulent and that petitioners intended to evade tax. Each of the notices of deficiency herein contains the following statement: "In the absence of adequate records, your taxable net income has been computed upon the basis of increase in net worth during the taxable years with adjustment for personal and other nondeductible amounts paid." The petitioners contend, on the other hand, that their records are adequate; that the respondent, in computing their incomes through use of such net worth method, has relied largely on estimates and assumptions, rather than on facts; and that the respondent has failed completely to carry his burden of proving any fraud, *153 either in the returns or otherwise. We agree with the petitioners. As before suggested, this is not a case in which there is no record of the taxpayer's receipts and expenditures. To the contrary, we here have books of account for the two theaters involved, together with the original daily box office reports which were the basic record of the receipts reflected on said books; and we also have a record (set forth in our Findings of Fact) of the miscellaneous items of income which petitioners received, other than from the theater business. No other source of taxable income has been established by the respondent; and, as regards the deductible expenses, no specific item of the same has been shown to have been improperly claimed on the returns. All entries in the books of account, and in the daily box office reports, were made by employees; and none of them was made by either of the petitioners. The books were set up and examined by certified public accountants. Also, the original returns, as well as the amended returns for 1948 and 1949, were all prepared by certified public accountants. One of respondent's examining agents testified that he could relate the figures on the tax returns *154 to the books and records, after making certain adjustments which he recognized might represent differences of opinion between him and petitioners' accountants as to classification; and that he was able to "reconcile the income per books with the income per returns." Moreover, this agent testified that both of the petitioners had cooperated fully with him during the course of the examination, by giving him all records which he requested so far as the same were available, by supplying whatever information they could, and by making no attempt to mislead or conceal information. He further testified that both the bookkeeper, and also each of the certified public accountants who had worked on the books and prepared the returns, likewise had cooperated fully with him, had supplied whatever information they could, and had interposed no objections. We recognize, of course, that use of the net worth method for estimating income need not be confined to situations where the taxpayer has no books; for books may be more consistent than truthful. Holland v. United States, 348 U.S. 121. But we further recognize, as did the Supreme Court in said case, that "The net worth technique * *155 * * is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income"; that it is circumstantial evidence which is only an approximation; and that employment of such method should be used with great care and restraint, "in the full realization that the taxpayer may be ensnared in a system which, though difficult for the prosecution to utilize, is equally hard for the defendant to refute." This seems particularly true in a case like the present, where the respondent has developed no source of income, other than the miscellaneous income items set forth in our Findings of Fact and the income from the theaters for which books of account were regularly maintained by persons other than the petitioners, whose honesty has not been impugned in the slightest. We are convinced that many of the items which respondent's agents have included in their computations as "nondeductible personal expenditures" have been swept into estimated taxable income because of petitioners' inability to satisfactorily explain, after the long period which intervened prior to the issuance of the notices of deficiency and the time of the trial, whether the same *156 were deductible expenditures, or expenditures in respect of assets otherwise included in the net worth statement. We are further convinced that many other items included in estimated income by the examining agents represent no more than honest differences of opinion between such agents and the petitioners' accountants, as to classification. We have found it impractical to set forth here all of the lengthy net worth statements which the respondent submitted; but we have shown as examples, in our Findings of Fact, that the computations made for the two most recent years involved, contained a significant percentage of errors; and that when such errors are corrected, the spread between the estimated net incomes and the net incomes per returns is not greater than that which might well have resulted from errors in the approximations, or from honest differences of opinion. Without in any way condemning the use of the net worth method for estimating income, we are convinced that, in the instant case, the petitioners' failure to report any understatement of income that may exist was not due to any intention on their part to file fraudulent returns or to evade tax. The respondent did attempt *157 to develop a few specific instances of willful fraud, which must be given consideration. One of the examining agents testified that petitioner had told him, in the presence of another examining agent, that he had withdrawn $100 per month from the theater receipts for personal expenses, which were not reflected on the theater books. The petitioner, in his rebuttal testimony, vigorously denied that he had made such statement. And it is significant, not only that the agent who so testified did not include the item in his net worth statement; but also that the other agent, who was supposed to have heard the statement, was present in the courtroom during petitioner's denial, and yet was not called upon to corroborate his associate. In our opinion, there is reasonable basis for concluding that the first agent may have misconstrued whatever statement the petitioner may have made to him. Respondent made another attempt to establish willful fraud, through the testimony of Chillum Langhorne Weiford. This witness testified that he had been employed in one of petitioner's theaters from April 1947 to January 1948, where he had acted at times as a ticket-taker at the door; that, while so acting, *158 petitioner had directed him not to destroy certain of the tickets which he accepted from patrons, but rather to turn them over to the girls in the box office, in lots of 50 tickets at a time, for purposes of resale; and that he did turn over tickets in such manner to three box office cashiers whom he, after some difficulty, identified. This witness further testified that he had, on some occasion, seen a daily box office report covering a day in the year previous to that in which he was employed; and that he was suspicious that the attendance shown thereon for the midnight show on such day was less than he would have expected from his experience in the following year of his employment. And, finally, Weiford testified that petitioner had purchased a radiophonograph for his personal quarters; and the witness inferred, concededly without personal knowledge of the facts, that such radio-phonograph had been purchased out of theater receipts. As regards the last of such charges, Weiford did not handle the theater books and had no knowledge of what items were charged thereon to petitioner's personal account; and it is significant that respondent made no attempt to develop this point, and *159 did not even mention it in his briefs. As regards the attendance at the midnight show, Weiford likewise had no personal knowledge of the number of patrons who attended a midnight show on any day preceding the year of his employment. And as regards the turning over of tickets to the box office for resale, one of the cashiers to whom he claimed to have given such tickets denied positively, in her rebuttal testimony, that he had ever delivered any tickets to her or that she had ever resold any previously issued tickets. Also, petitioner testified, in rebuttal, that he had never asked or directed Weiford to proceed in the manner to which he had testified. Moreover, it was developed during the cross-examination of Weiford that, both before and after his employment by petitioner, he was employed by a competing chain of theaters; that he had been moved from one theater to another by the management of such competing chain, because of an embarrassing incident with a woman; and that he had left petitioner's employment without giving notice and while he was indebted to petitioner on a loan which has never been repaid. The Court carefully observed the demeanor of Weiford during the course of *160 his testimony; and we here conclude that his testimony was not worthy of belief. We reject all his testimony as not being credible. We hold, from an analysis of all the evidence, that respondent has not sustained his burden of proving that petitioners were guilty of filing a false or fraudulent return for any of the years 1946 through 1949, with intent to evade tax within the meaning of section 276(a). We further hold that assessment and collection of any deficiency or addition to tax, for any of said years 1946 through 1949, are barred by limitation, under the provisions of section 275(a). II There remains for consideration the question of whether the deficiency and the addition to tax for fraud, which respondent determined in respect of the year 1950, should be approved. The petitioners concede that assessment and collection of any liabilities for said year are not barred by limitation, because of the consent (Form 872) which was executed. As regards the addition to tax for fraud, we hold, in accordance with the reasons which we have set forth in the preceding part of this Opinion, that such addition to tax should not be imposed. We are convinced that no part of any deficiency *161 for the year 1950 is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. As regards the deficiency determined by respondent for said year, we have heretofore pointed out in our Findings of Fact that this was determined solely on the basis of a net worth computation; and that the respondent did not, in his notice of deficiency, make any adjustment to any specific item of income or any specific deduction, shown on the return. Also, we have shown in our Findings of Fact that the net worth computation made by respondent for said year contains a number of errors; and that, if these errors are corrected, the difference between the net income determined by estimate and that reported on the return, is not more than $2,386.52 - although the amount of the gross receipts for said year, per return, from petitioner's theater business alone was $228,609.45. Such error demonstrates the danger inherent in any attempt to determine income by estimate, rather than by making specific adjustments to the income per books, which would provide the taxpayer with an opportunity to meet and to overcome the same, if he can. In our opinion the books of account of the *162 present petitioner, which were set up, maintained, and examined by a competent bookkeeper and a competent certified public accountant whose integrity has in no way been impugned, are evidence entitled to greater weight than is the circumstantial evidence represented by the net worth statement. And this is especially true in the present case, where the difference between the estimated net income after adjustment for errors, and the income reported on the return is not greater than that which might well have resulted from errors in approximation. Accordingly, we accept the books as the best evidence; and, in the absence of any evidence of any specific error in the books or in the return prepared in accordance therewith, we hold that there is no deficiency in respect of petitioners' income tax for the year 1950. Decisions will be entered for the petitioners. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment at any time. * * *↩
2. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩